14  241
148  603

# Brocket *versus* The Ohio and Pennsylvania Railroad Company.

The right to enter upon *land* and to appropriate as much thereof as may be necessary for its railroad, granted to The Ohio and Pennsylvania Railroad Company, by the Ohio act, adopted by the Pennsylvania act of 11th April, 1848, includes the right to remove *a dwelling-house.*

CERTIORARI to the Common Pleas of *Beaver county.*

An act of appropriation and description of the lands and tenements of Brocket, intended to be taken, was filed on the part of the Ohio and Pennsylvania Railroad Company. Appraisers were appointed, whose report was set aside and new appraisers appointed. They reported that they met, &c., and after being duly sworn, and after hearing the testimony, do appraise and assess the damages to the property of the defendant (Brocket) at $500, and benefits none.

The proceeding was had under the ninth section of the Ohio act, chartering the company. The act was adopted by the Legislature of Pennsylvania. See act in the *Pamphlet Laws* of 1849, p. 754, &c.

The ninth section provides, that "such corporation is authorized to enter upon any *land* for the purpose of examining and surveying its railroad line, and may appropriate as much thereof as may be deemed necessary for its railroad, including necessary side-tracks, depots, work-shops, and water-stations, materials for construction, except timber, a right of way over adjacent lands, &c. The company are also authorized to purchase any such lands, or interest of the owner of such land, or in case the same is owned by a person insane, or an infant, at a price to be agreed upon by the guardian or parent of such insane person, or infant, if the same shall be approved by the court in which the description shall be filed. The award of the arbitrators appointed, as to the matter of damages, may be reviewed by the court, on written exceptions filed by either party; and the court shall take such order therein, as right and justice may require, by ordering a new appraisement, on good cause shown," &c.

Exceptions were filed on the part of Brocket, which were subsequently overruled. Certiorari filed.

The material errors assigned were:—That the court erred in overruling the third exception, which was, that the Railroad Company have no authority, by their charter or otherwise, to remove or take off the dwelling-house or out-buildings, or disturb the owner or the inhabitants thereof, by removing or taking off the

same, without the consent of the said owner, or inhabitants therein.

The court erred in not submitting the case to a jury of the county to assess the damages on the first report of appraisers, instead of ordering and appointing a second set for that purpose.

*Shannon,* for plaintiff in error, contended, that the term *land,* in the act, does not include buildings or tenements; that it is a term of art, and to be construed strictly; and that, technically, it means *ground;* and that, under this term, the company could not, in constructing their road,. remove a *dwelling-house.* That if a house is taken, it could not be returned, if the route of the road be changed: also, that other roads are restricted from passing through dwelling-houses: 3 *Peters' Dig.* 212; 1 *Baldwin* 215–16; *U. S. Law Jour.* 43–4; 6 *Whar.* 25; 2 *Kent* 299; 1 *Black.* 136; 2 *id.* 5 and 198. The trial by jury is a fundamental law, made sacred·by the constitution, and cannot be legislated away; and if the legislative act impugns a constitutional principle, the act must give way and be rejected on the score of repugnance, 2 *Dal.* 309. Hence, the court below exceeded their jurisdiction by ordering a second appraisal, instead of submitting the case to a jury of the county, to assess the damages, as desired by the defendant below; 8 *Watts* 243.

*Agnew,* for the Company: That the term *land* includes not only the face of the earth, but every thing under it or over it. —That the right to have the compensation ascertained by another mode than by a jury, is not to be questioned. To deny it would overturn the whole system of road law, as well as the proceedings where property has been taken, under numerous special acts, for public use. That a distinction exists between the taking of property for public use, and the act of *depriving* a citizen of his rights. The former is the exercise of sovereign power in the State, subject to which the citizen holds his rights, and implies a mere exchange of one thing for another. Deprivation implies *loss,* and involves the idea of forfeiture, and without compensation. Hence they are the subject of distinct and independent provisions in the Declaration of Rights: *Constitution,* 9 art., sec. 9 and 10; also art. 7, sec. 4.

The right of eminent domain or inherent sovereign power, is plenary, and subject to no restrictions except those expressly imposed; which are, that the object shall be a *public one,* and that *compensation* shall be made. But the *mode* of making compensation is nowhere prescribed, and is consequently left to the discretion and justice of the legislature: Pittsburgh *v.* Scott, 1 *Barr* 314; Mon. Nav. Co. *v.* Coons, 6 *W. & Ser.* 113; *Baldwin Rep.* 221–2.

[Brocket *v.* Ohio and Pennsylvania Railroad Co.]

The opinion of the court was delivered by

GIBSON, C. J.—This is a question not of power, but of intention. The constitution subjects all private property without distinction to public use; and a dwelling-house may be taken for it as legitimately as a forest or a field. Had not the Pea Patch Island in the Delaware been previously purchased by the United States, it might have been adversely taken for the site of the present fortress, and the buildings on it might have been demolished. Houses are often taken down to make way for streets; and in this city, two thoroughfares have been opened through blocks of houses to a neighboring street. In Philadelphia, the occurrence of such *things is frequent.* What is more to the purpose, the State railroad from that city to Columbia, passes diagonally through blocks of houses in the city of Lancaster. The single question, therefore, is whether the word *land,* in this joint act of incorporation, is to have its legal meaning, or, if there be a difference, its popular one.

The jurisprudence of the enacting States is based upon the common law of England, whose rules of interpretation are our rules; and it is text-book law, that terms of art in a statute or a deed are to be taken in their technical sense, because they have a definite meaning, which is supposed to have been understood by those who were, or ought to have been learned in the law. In England, every act of Parliament, as well as every conveyance, is drawn by counsel. The word land, both there and here, is a term of art, and the most comprehensive one that could be applied to the subject of a grant. Lord COKE says that it is *nomen generalissimum;* that it includes every thing fixed to the ground, and every thing above or below the surface of it; that it comprehends castles, houses, and other buildings; and that, not only the soil, but every thing in it or on it, passes by it. It, therefore, distinctly includes a mansion, when its generality is not restrained by the context.

But the other provisions of the section in which it occurs, have nothing to show that the word was used in a peculiar sense. They authorize the company to enter on land, and appropriate as much of it, "except timber," as may be necessary for its purposes; and why an exception, if the word land was not supposed to embrace every thing else? The expression of one thing is the exclusion of another; and consequently no further exception was intended. The word premises, which includes every part and parcel of a messuage, is used in the section as its synonyme; and the term property, which is a very general one, is used in the same sense. The company is authorized to purchase the land, or interest of an infant or insane person from his guardian or committee; or to take it, in case of a disagreement, by an act of appropriation. It can take without agreement whatever it can take with it; and no one

will doubt that a guardian or committee, thus authorized, might sell a dwelling-house. It was evidently the purpose of the framers of the act to put into the company's hands every means, without restriction, that might conduce to the perfection of the work.

If, then, the general effect of this technical word is not restrained by express provision or necessary implication in the context, what reason is there to think that dwellings were intended to be excepted from the effect of it? The joint act of incorporation is not only a contract with the company, but a compact between the States that are parties to it; and it is not to be supposed that private interests would be allowed to stand in the way of the greatest thoroughfare in the world; and one by which the valley of the Mississippi and the cities of the seaboard must be infinitely benefited. The charter is not to be compared with the charter from an individual State; it is to be liberally construed with reference to the magnitude of the enterprize, by giving the company the necessary means to accomplish the purposes of its creation. Like a treaty, it is the law of the contracting States, without being subject to interpretation by the local usages of either. The same construction of it must be made in both.

But if that were otherwise, the consequence would be the same; for we know of no legislative or popular interpretation of the word that would restrain the meaning of it. On the contrary, our legislation has been consistent with the broadest use of it. Power to interfere with houses, churches, or burying grounds, was expressly withheld from the Central Railroad Company, and sometimes, but not always, it has been withheld from turnpike and canal companies. It was not withheld from the canal commissioners in laying the State railroad, and canals; and so far as legislative interpretation goes, it shows that express exemption was thought necessary where it was intended; and that no pervading prejudice has been felt for the inviolability of the citizen's castle. The abodes of the living are not more inviolable than the abodes of the dead; yet thousands of human bones lie beneath the walks and alleys of Washington Square in Philadelphia, once its Potter's Field, now its most frequented pleasure-ground. If a cemetery cannot impede the march of improvement for purposes of recreation, how can the owner of a cottage expect that it will impede a work of necessity? The legislation of a country necessarily takes its tone from the temper and the necessities of the age. A house, a church, a grave-yard, or any thing else, may be conveniently privileged in an act to incorporate a turnpike or a canal company, because it may be avoided without lessening the usefulness of the work; but every deflexion from a right line in the bed of a railroad, is proportionately productive of danger to property and life. It is indispensable to safety and speed that the route of it be as direct as the surface of the country will permit; but they could not be

[Brocket *v.* Pennsylvania and Ohio Railroad Co.]

attained in a settled country if every hovel or house were privileged; and thus a *quasi* national work, intended for posterity, might be botched through a respect for the sacredness of temporary erections.   The course of a railroad might be insuperably obstructed by the obstinacy of a proprietor in the gorge of a mountain, or the pass be made, at least, difficult and dangerous. A mangled passenger, inquiring the reason of a deflexion, when the cause of it had disappeared, might be told of our infinite respect for property at the expense of safety; but the information would neither ease his pain nor set his leg.

Abuse of the company's power in the exercise of it, is remedial or imaginary.   Every delegated power may be abused, but it follows not that power must not be delegated.   It is incredible that the directors would turn a family out of doors at an inclement season, and incur personal liability, to show their authority, for the abuse of which they would become trespassers from the beginning; while the assessors of compensation would incline to make the company itself smart for it.   It is idle to suppose that a dwelling-house will be removed unnecessarily or wantonly.   A proprietor's family is dealt with tenderly, to prevent a pretext for swelling the compensation.   A company's injury to private property is considered a windfall, and the proprietor never fails to get out of it at least all that is in it.   He has got it in this case, and the act complained of is authorized by the charter.   The exceptions to the award are therefore unfounded.

Award of the arbitrators, and judgment of the Common Pleas affirmed.

COULTER, J., dissented.